# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**UNITED STATES OF AMERICA,**

**v.**                                     **Case No. 3:17cr022/MCR**

**DONALD GARRETTE.**

_____

## <u>ORDER</u>

This matter is before the Court on Defendant Donald Garrette's Motion to Suppress Evidence, *see* ECF No. 18, which the Government opposes, *see* ECF No. 21. An evidentiary hearing has been conducted. Having fully considered the evidence, the applicable law, and the parties' written and oral arguments of the parties, the Court finds that Garrette's motion is due to be denied.

Garrette is charged in a one-count indictment with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Garrette moves, pursuant to Federal Rule of Criminal Procedure 12(b)(3), for suppression of the firearm, asserting that the traffic stop leading to its recovery was an unlawful seizure in violation of the Fourth Amendment to the United States Constitution. More specifically, Garrette argues that law enforcement did not have probable cause or reasonable suspicion to stop his vehicle or search its interior and, therefore, the firearm and ammunition found inside it are inadmissible.

## I.    Factual Findings[1]

A little after midnight on September 2, 2016, Escambia County Sheriff's Deputy Morgan A. Smith was on uniformed patrol in the Wedgewood community of Pensacola, Florida.  Wedgewood is a predominantly residential area known to law enforcement for illegal activity, including drugs, weapons, and vehicle thefts.  At approximately 12:04 a.m., Deputy Smith observed a Ford Explorer ("the Explorer") come to a complete stop at a stop sign at the intersection of Rolling Hills Road and Wingfoot Way, activate its left-turn signal, and then turn left onto Wingfoot Way. The Explorer was leaving a section of Wedgewood that is comprised primarily of private homes, with only one business, a bar called "400 Club," and no outlet or other access to any major roadway.  Deputy Smith fell in behind the Explorer and saw that it had an orange transporter license plate.  When Deputy Smith ran the transporter plate number on his in-car computer, he learned that it was registered to a business called Willie G's.[2]  Deputy Smith had been working the midnight patrol shift in Wedgewood for almost a year and, in that time, he had never seen a vehicle with a transporter plate while he was on duty.

---

[1] The following findings of fact are based on the undisputed evidence presented at the suppression hearing.

[2] The transporter license plate actually was registered to Willie Gaines Detail at 6806 Gulley Lane.  *See* Government's Exhibit J at 2.  At the suppression hearing, Deputy Smith could not recall whether the initial registration information he received on his in-car computer identified the business as Willie G's, Willie G's Detail, Willie Gaines, or Willie Gaines Detail.

Concerned that the transporter tag was being used improperly, Deputy Smith activated his emergency lights and sirens to initiate a traffic stop. The Explorer drove forward and made two turns (one left turn, one right turn), before slowing to a stop on the side of the road. Because the Explorer did not immediately stop, Deputy Smith radioed for assistance and a canine unit. As Deputy Smith exited his vehicle and prepared to approach the Explorer, it suddenly pulled back onto the roadway and drove off at an approximate speed of 10 miles per hour. Deputy Smith returned to his patrol car, again activated its emergency lights and sirens, and followed behind the Explorer. The Explorer drove forward for about a minute, its taillights illuminating sporadically, until it pulled into a residential driveway and parked.[3] Two individuals, who were later identified as Defendant Donald Garrette and his girlfriend, exited the Explorer. Deputy Smith ordered the couple back into the Explorer and they complied. Deputy Smith spoke with Garrette, who ultimately admitted that he had been driving the Explorer, that his driver's license was invalid, and that he drove away after initially stopping in order to get the Explorer to his parent's house. After verifying through his in-car computer to verify that Garrette's

---

[3] Garrette asserts that as he drove away, he activated the Explorer's emergency flashers, also known as hazard lights, in an effort to communicate to Deputy Smith that he was not attempting to flee. Deputy Smith testified that when he began following the Explorer for the second time, he observed its taillights illuminating sporadically as if the driver kept tapping the brakes. Having reviewed the video footage of this encounter, which was taken by Deputy Smith's in-car video recorder, the Court finds that the sporadic illumination of the Explorer's taillights resulted from Garrette's repeated tapping of the vehicle's brakes.

driver's license was revoked, Deputy Smith placed Garrette under arrest. By this time, the canine unit had arrived on scene, performed a sniff around the exterior of the Explorer, and alerted to the presence of narcotics. Law enforcement then searched the Explorer and discovered, among other things, the firearm and ammunition that form the basis of the indictment in this case.

## II. Discussion

"The Fourth Amendment protects individuals from unreasonable search and seizure." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001); U.S. Const. amend. IV. Traffic stops are seizures under the Fourth Amendment, *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), and are constitutionally reasonable only when supported by either probable cause to believe a traffic violation has occurred or reasonable suspicion of criminal activity, *see United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008). There is no dispute that Garrette was "seized" by Deputy Smith during the traffic stop in this case. However, the parties disagree on the precise moment when the encounter became a seizure for Fourth Amendment purposes and whether, at that point, the requisite level of suspicion or cause supported Deputy Smith's actions. Garrette argues he was seized when he initially stopped the Explorer on the side of the road for several seconds before driving it slowly to his parent's house. Garrette asserts that when he first stopped, there was no reasonable suspicion or probable cause for an investigative detention by law

enforcement.  In response, the Government contends Garrette was not seized until he parked the Explorer in his parent's driveway, at which point, both probable cause and reasonable suspicion existed.

The Court first addresses the question of when a Fourth Amendment seizure occurred.  A person is "seized" within the meaning of the Fourth Amendment "only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  Absent the use of physical force, a seizure requires both a "show of authority" from law enforcement and "submission to [that] assertion of authority" by the person at whom it is directed.  *See California v. Hodari D*., 499 U.S. 621, 626 (1991).  Although there is no bright-line test for determining when a person has submitted to a show of authority, it is well-established that "submission" requires, at minimum, that a person yield to or manifest compliance with law enforcement directives.  *See Hodari*, 499 U.S. at 626, 629 (holding that a seizure is not effected through a show of authority until the subject yields); *Wilson v. Northcutt*, 987 F.2d 719, 721-22 (11th Cir. 1993) (holding that defendant was not seized for Fourth Amendment purposes where she locked herself in a bathroom and did not yield or submit when deputy sheriffs commanded her to come out).  Without actual submission to police authority, there is no seizure.  *Brendlin v. California*, 551 U.S. 249, 254 (2007).

"[T]here is at most an attempted seizure," which is beyond the scope of the Fourth Amendment. *Id*.

Generally, a driver of a vehicle being stopped by police submits to the show of authority manifested by the flashing emergency lights and siren by pulling over and awaiting the arrival of a police officer; in that scenario, the driver and other occupants of the vehicle are deemed to be seized at the moment the vehicle comes to a halt on the side of the road. *See Brendlin*, 551 U.S. at 263; *Arizona v. Johnson*, 555 U.S. 323 (2009). However, in cases where a driver resumes driving or otherwise retreats either immediately or shortly after bringing his car to a halt, courts have consistently held that the driver's temporary halt in movement does not constitute acquiescence to police authority. *See United States v. Seymour*, 739 F.3d 923, 928-29 (6th Cir. 2014) (holding that a defendant did not submit to police authority and was not seized where, as his car slowed to a stop, defendant "leaped out" of it and ran); *United States v. Salazar*, 609 F.3d 1059 (10th Cir. 2010) (holding driver not seized while he slowly backed his truck away from patrol car for 20 seconds, momentarily stopped, then slowly drove towards patrol car; driver only submitted to police authority when he complied with officer's command to park and exit the truck); *United States v. Baldwin*, 496 F.3d 215, 218 (2d Cir. 2007) (holding that a driver did not submit to police authority and was not seized where he pulled to a stop in response to a patrol car's overhead lights and siren, but sped away when police

officers approached his vehicle on foot); *United States v. Washington*, 12 F.3d 1128, 1132 (D.C. Cir. 1994) (holding that a driver did not submit to a police officer's authority when he momentarily complied with an order to pull car over to side of road, but then drove away as the officer approached the vehicle on foot). Rather, the driver is not seized for Fourth Amendment purposes until being physically apprehended by police. *See id*. The same is true where an individual briefly pauses before retreating from law enforcement during non-vehicular investigative detentions. *See United States v. Huertas*, -- F.3d --, 2017 WL 3122291 (2d Cir. July 24, 2017) (no submission to police authority when defendant answered officer's questions for 30-60 seconds, but fled when officer got out of patrol car); *United States v. Valentine*, 232 F.3d 350, 359 (3d Cir. 2000) (holding that "[e]ven if [suspect] paused for a few moments and gave his name [before running away], he did not submit in any realistic sense" and thus there was no seizure); *United States v. Hernandez,* 27 F.3d 1403, 1406–1407 (9th Cir.1994) (no submission to police authority when suspect, instructed by officer to "stop right there," pauses momentarily and makes eye contact with the officer but flees thereafter). In sum, Fourth Amendment jurisprudence makes clear that "to comply with an order to stop—and thus to become seized—a [person] must do more than halt temporarily; he must submit to police authority, for there is no seizure without actual submission." *See Baldwin*, 496 F.3d at 218.

Applying these principles to this case, the Court concludes that Garrette's brief stop of the Explorer on the side of the road followed by him driving off as Deputy Smith approached on foot cannot be construed as acquiescence to police authority. Deputy Smith's activation of his emergency lights and siren was a "show of authority" ordering the Explorer to halt for as long as was reasonably necessary for the deputy to effectuate the purpose of the traffic stop. *See Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015) (stating that a traffic stop may not extend beyond the time reasonably necessary to address the unlawful activity that warranted the stop and ordinary inquiries incident to the stop); *United States v. Ramirez*, 476 F.3d 1231, 1236 (stating that "the duration of [a] traffic stop must be limited to the time necessary to effectuate the purpose of the stop"). Garrette did not comply with this order. Instead, he halted temporarily and then resisted Deputy Smith's attempt to effectuate the purpose of the traffic stop by driving away. Garrette's defiance was less overt than a high-speed flight, but it was still defiance. And defiance is the antithesis of submission to police authority. Deputy Smith was compelled to reactivate his lights and siren, resume pursuit of the Explorer, and follow until it halted again at a time and place of Garrette's choosing. It was not until Garrette parked the Explorer in his parent's driveway that he submitted himself "in any realistic sense" to Deputy Smith's show of authority by following the deputy's orders. *See Valentine*, 232 F.3d at 359. Accordingly, the Court finds that Garrette

was not "seized" within the meaning of the Fourth Amendment when he briefly stopped the Explorer for the first time on the roadside. Indeed, the Fourth Amendment seizure occurred only once Garrette stopped the Explorer the second and final time, in his parent's driveway.

The Court next addresses the question of whether probable cause or reasonable suspicion existed when Deputy Smith seized Garrette in his parent's driveway. For a traffic stop to be supported by probable cause, there must be sufficient "facts and circumstances within [the] officer's knowledge and of which the officer has reasonably trustworthy information . . . to warrant a prudent man in believing" that the person stopped has committed a criminal or traffic offense. *United States v. House*, 684 F.3d 1173, 1199 (11th Cir. 2012). Reasonable suspicion is a "less demanding standard than probable cause," but still requires at least "a particularized and objective basis" for suspecting the person stopped of criminal activity. *United States v. Lewis*, 674 F.3d 1298, 1303, 1305 (11th Cir. 2012). The test under either standard is one of objective reasonableness: whether the totality of the circumstances known to the detaining officer at the time of the seizure, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause or reasonable suspicion. *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *see also United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003).

In this case, the totality of the circumstances known to Deputy Smith at the time of the seizure provided a particularized and objective basis for believing that the driver of the Explorer was violating Florida Statutes § 320.261, which makes it a second degree misdemeanor to knowingly attach a license plate to a vehicle for which the plate is not lawfully assigned. First, Deputy Smith observed the Explorer driving late at night through a high crime area, known in particular for vehicle thefts, a conclusion based on his law enforcement experience patrolling there on the midnight shift for almost a year. While not enough, standing alone, to establish reasonable suspicion or probable cause, the Supreme Court includes "the fact that [a] stop occurred in a 'high crime area' among the relevant contextual considerations" in a Fourth Amendment reasonableness analysis. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *accord United States v. Gordon*, 231 F.3d 750, 755-56 (11th Cir. 2000). Second, the Explorer had a transporter license plate that was registered to an automotive detailing business called Willie G's. In Florida, transporter plates are only valid when displayed on a vehicle in the possession of a transporter (*i.e.*, a person whose business involves the transport of unregistered motor vehicles) while the vehicle is being transported in the course of the transporter's business. *See* Fla. Stat. § 320.133. Willie G's was not located in the residential neighborhood where Deputy Smith encountered the Explorer, there were no visible markings on the Explorer identifying it as belonging to Willie G's, and

Deputy Smith had never seen a transporter plate in the neighborhood during his year working the midnight shift there. At a minimum, given the fact that the only open business in the area was a bar and the improbability that a local automotive detailing business would be transporting a motor vehicle in the course of its business in the middle of a weekend night, an objectively reasonable police officer would be warranted in suspecting that the transporter plate had been improperly attached to the Explorer and, therefore, constitutionally permitted to conduct a detention of reasonable scope and duration—in this case, a traffic stop—to investigate further. Taken with Garrette's defiance of Deputy Smith's order to stop by driving away, these factors would also warrant a prudent man in believing that Garrette was involved in activity considerably more nefarious than the suspected license plate violation that formed the basis for the initial, attempted stop on the roadside. *See United States v. Franklin*, 323 F.3d 1298, (11th Cir. 2003) ("While flight is not proof of wrongdoing, it is indicative of such. Innocent persons might run from police officers; but flight creates an ambiguity; and the officers may stop the person to resolve the ambiguity.") (citing *Wardlow*, 528 U.S. at 124-25). The law does not require absolute certainty or even probable cause before an officer stops a vehicle; the officer need only reasonably suspect that the vehicle's occupants are involved in criminal activity. *United States v. Williams*, 619 F.3d 1269, 1271 (11th Cir. 2010). In this case, Deputy Smith's observations, the surrounding facts, and the Explorer's

flight provided reasonable suspicion that the driver of the Explorer, Garrette, was engaged in criminal activity.

Moreover, when Garrette defied Deputy Smith's order to stop and resumed driving, his actions also provided probable cause to arrest him for fleeing or attempting to elude, in violation of Florida Statutes § 316.1935(1). Section 316.1935(1) makes it a felony for a driver, after stopping his vehicle in response to a law enforcement directive, to willfully flee in an attempt to elude the officer. This statutory provision requires a driver to remain stopped for the duration of the encounter regardless of the lawfulness of the officer's initial order to stop. *See State v. Kirer*, 120 So.3d 60 (Fla. 4th DCA 2013); *Henderson v. State*, 88 So.3d 1060, 1062-63 (Fla. 1st DCA 2012); *State v. McCune*, 772 So.2d 596 (Fla. 5th DCA 2000); *see also DeRosa v. Rambosk*, 732 F. Supp. 2d 1285, 1295 (M.D. Fla. 2010) (applying Fla. Stat. § 316.1935). Thus, under Florida law, even if Deputy Smith had no constitutionally valid reason to detain the Explorer that night, Garrette was still required to remain stopped when the deputy so directed. *See id*. Garrette's failure to do so amounted to the commission of a felony in Deputy Smith's presence, giving him probable cause to stop the Explorer for a second time. *See Virginia v. Moore*, 553 U.S. 164, 171 (2008) ("[W]arrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution.").

Garrette argues that there was no probable cause with respect to the crime of fleeing or attempting to elude because he did not actually try to get away from Deputy Smith or evade arrest, but rather he just slowly drove the Explorer to his parent's house, where he fully surrendered himself to Deputy Smith. This is incorrect. Neither the speed at which a driver flees nor the distance he travels before finally stopping is determinative of whether probable cause exists for the crime of fleeing or attempting to elude. *See Kirer*, 120 So.3d at 64 (holding that deputy had probable cause to stop defendant for fleeing or attempting to elude where, in response to lights and sirens, defendant pulled out of driveway, drove 10 miles per hour for five minutes, made five turns, and stopped when law enforcement blocked his way); *Henderson*, 88 So.3d at 1062 (affirming denial of motion to suppress where defendant responded to lights and sirens by "slow[ing], as if to pull off on the grass shoulder, but then continu[ing] to drive for one to two miles" without speeding or violating any traffic laws"). Instead, this offense focuses on "whether law enforcement's lights and sirens were activated and whether the defendant knew he or she was being ordered to stop by law enforcement and whether the person chose to defy that order by failing to stop." *Ward v. State*, 59 So.3d 1220, 1223 (Fla. 4th DCA 2011). The facts and circumstances within Deputy Smith's knowledge would warrant a prudent officer in believing that the driver of the Explorer both knew he was being ordered to stop by law enforcement and was choosing to defy that order

by driving away. From the standpoint of an objectively reasonable police officer, Garrette's momentary stop and subsequent driving away could have represented a nascent attempt to flee, an effort to buy time so that he could dispose of contraband or formulate an explanation to provide to law enforcement, or simply a period of indecision before he decided what to do. In light of these reasonable interpretations of Garrette's actions in response to Deputy Smith's orders to stop, the Court cannot conclude that probable cause was lacking for the crime of fleeing or attempting to elude.[4]

In sum, for the foregoing reasons, the Court concludes that: (1) Garrette was not seized for Fourth Amendment purposes until he complied with Deputy Smith's show of authority by parking the Explorer in his parent's driveway; and (2) at that

---

[4] Importantly for this case, under Florida law, the quantum of evidence necessary to support a finding of probable cause as to the crime of fleeing or attempting to elude, Fla. Stat. § 316.1935, is substantially different than that required for the crime of resisting an officer without violence, Fla. Stat. § 843.02. It is true, as Garrette argues, that the crime of resisting an officer without violence can only arise where the officer is engaged "in the lawful execution of [a] legal duty." *See* Fla. Stat. § 843.02. It is also true that in cases involving investigative detentions, whether an officer was engaged in a lawful duty depends on whether reasonable suspicion to detain the person was present. *See S.S. v. State*, 154 So.3d 1217, 1220 (Fla. 4th DCA 2015). If an officer lacked reasonable suspicion, then he could not lawfully command a person to stop and the person's disobedience of an unlawful command to stop may not support a finding of reasonable suspicion or probable cause for the crime of resisting an officer without violence. *See Palmer v. State*, 112 So.3d 606, 607 (Fla. 4th DCA 2013). The Court finds that while these legal truisms are contextually informative, they are wholly irrelevant to the constitutional reasonableness of Deputy Smith's actions in this case. The Government has never suggested that Deputy Smith had any basis to stop Garrette for resisting an officer without violence. Instead, the Government has only argued that Deputy Smith was justified in detaining Garrette for the crime of fleeing or attempting to elude, in violation of Fla. Stat. § 316.1935, which "obviates the necessity of determining whether there was reasonable suspicion or probable cause for the initial attempt to stop." *See Henderson*, 88 So.3d at 1062.

Case No. 3:17cr020/MCR

point, Deputy Smith had both reasonable suspicion and probable cause to detain him.

Accordingly, Defendant's Motion to Suppress Evidence, ECF No. 18, is **DENIED**.

**SO ORDERED**, this 4th day of August, 2017.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**